UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOMOTION TECH, INC.,

      Plaintiff/ Counter-Defendant,

v.

                                        Case No. 25-cv-12081
                                        HON. MARK A. GOLDSMITH

SCOTT VANCE,

      Defendant/ Counter-Plaintiff,

v.

TT21 SMART REPAIR SERVICES, INC.,
and ADAM DIOGUARDI

      Counter-Defendants.

_____/

## OPINION & ORDER DENYING COUNTER-DEFENDANTS' ADAM DIOGUARDI, AUTOMOTION TECH INC., AND TT21 SMART REPAIR SERVICES INC.'S MOTIONS TO DISMISS (Dkts. 23, 24, 25)

Counter-Plaintiff Scott Vance brings this action against Counter-Defendants Automotion Tech, Inc. (AMT), TT21 Smart Repair Services, Inc. (TT21), and Adam Dioguardi for breach of contract-related claims and a fraud claim that he alleges arises from his failed business relationship with Counter-Defendants.  Am. Countercl. (Dkt. 20).  Before the Court is Counter-Defendants' motions to dismiss (Dkts. 23, 24, 25).[1]  For the reasons that follow, the Court denies each motion.

## I.    BACKGROUND

---

[1]Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the motions, the briefing also includes Vance's responses (Dkts. 27, 28).

The amended counter-complaint alleges the following facts.  Vance is a paintless dent repair (PDR) technician.  Am. Countercl. ¶ 3.  He was employed by Ford Motor Company but he wanted to be in business for himself.  Id.  PDR technicians are in high-demand and often travel extensively for jobs for car dealerships, autobody shops, and other customers.  Id. ¶¶ 4–5.  Around July 2023, Vance answered an online advertisement, placed by Dioguardi, seeking a PDR technician for a job in Toledo, Ohio.  Id. ¶ 7.  Vance spoke with Dioguardi and his business partner, Carlo Travaglini who told Vance that they were principals of AMT, along with a third principal, Fabio Vigna.  Id. ¶ 8.  Shortly thereafter, Vance took a leave of absence from Ford and signed an independent contract agreement to perform PDR services for AMT in Toledo.  Id. ¶ 11.  As part of this agreement, Vance would earn 50% of AMT's revenue for the work he would perform.  Id.

Vance completed the Toledo job and traveled to Texas for another job at Travaglini's request.  Id. ¶ 12.  Vance was paid for the Texas work through TT21.  Id. ¶ 13.  Travaglini explained that TT21 was "his" company whereas AMT was co-owned by Travaglini, Vigna, and Dioguardi.  Id. 14.  Travaglini and Dioguardi "appeared to treat the two entities interchangeably" and Dioguardi told Vance that AMT and TT21 were "two sides of the same house."  Id. ¶¶ 15–16 (punctuation modified).

On or about November 10, 2023, while staying at Vance's house, Travaglini proposed that Vance join him, Dioguardi, and Vigna in their PDR business.  Id. ¶¶ 18, 21.  Travaglini offered Vance 50% ownership of both AMT and TT21.  Id. ¶ 21.  Travaglini claimed that he owned TT21 outright but would need to confirm with Dioguardi and Vigna about the AMT equity offer he made Vance.  Id. ¶ 22.  Under the proposed arrangement, Dioguardi would line up jobs for Vance.  Id. ¶ 23.  Travaglini also represented that he, Dioguardi, and Vigna had a

network of other PDR technicians who could support Vance.  Id.  Dioguardi would be responsible for sales, billing, and paperwork and Vance and Travaglini would split the jobs and perform the work.  Id. ¶ 25.

On or about November 25, 2023, Vance, Travaglini, Dioguardi, and Vigna met by Google Meet to finalize the terms of their relationship going forward.  Id. ¶ 27.  The group reaffirmed Travaglini's proposal—AMT and TT21 would "supply other skilled PDR technicians" and new PDR jobs if Vance and Travaglini managed each job.  Id. ¶ 28.  Vance would receive 50% of the gross profits of the jobs he worked and he would receive 5% of the total gross revenue collected for the work performed by AMT/TT21.  Id. ¶ 29.  Dioguardi said he would memorialize the relationship agreed to during the Google Meet, but he never did.  Id. ¶ 30. In reliance on Dioguardi's representations, Vance resigned from Ford to work on AMT/TT21 projects full-time.  Id. ¶ 31.

Shortly thereafter, Travaglini returned to Italy.  Id. ¶ 32.  Vance also discovered that Dioguardi did not have any contacts in the PDR industry and he failed to generate any new work for AMT/TT21.  Id. ¶¶ 32–33.  In April of 2024, Vance and his wife built relationships in the PDR industry, by traveling to meet potential customers.  Id. ¶ 35.  They also "lined up" projects in multiple states, all at Vance's own expense.  Id.  Dioguardi arranged for technicians to travel to these jobs and the parties invoiced their customers through both AMT and TT21.  Id. ¶ 36. Dioguardi and Travaglini transferred funds from both entities to Vance.  Id. ¶ 37.

On or around April 2, 2024, Travaglini was detained trying to enter the United States illegally.  Id. ¶ 38.  Travaglini had represented to Vance that he was allowed to live and work in the United States but he actually did not have the proper authorization.  Id. ¶ 39.

Travaglini being barred from the United States meant that he would not be able to split

3

the jobs with Vance.  Id. ¶ 42.  Vance had still also not received his promised equity.  Id. ¶ 41. Vance voiced his concerns to Travaglini and Dioguardi.  Id. ¶ 43.  On or about April 7, 2024, on a phone call, Dioguardi and Travaglini agreed that Vance would retain 100% of the profits of any job he worked personally and he would receive 50% of all of AMT/TT21's profits going forward.  Id.  ¶ 44.  This promise was "in line" with Travaglini's prior promise to make Vance a 50% owner in AMT and TT21.  Id.  Travaglini promised that he would advance Vance $30,000 for current and future expenses.  Id. ¶ 45.  Vance never received the money.  Id.  Travaglini claimed, for the first time, that he was the majority owner of AMT and that he would formalize Vance's equity relationship when he returned to the United States.  Id. ¶ 46.

For the next two months, Vance brought in new work.  Id. ¶ 48.  He received 100% of the profits from the jobs he personally completed and 50% of the profits for the other jobs.  Id.  The group "billed through" both AMT and TT21.  Id.  Dioguardi sent invoices to customers based on the jobs Vance worked but he continued to fail to find new technicians to help Vance complete the work.  Id. ¶¶ 49, 51.

In June of 2024, Dioguardi told Vance that he and Travaglini had a plan to resolve Travaglini's immigration issues.  Id. ¶ 52.  The plan involved "rapidly investing over $100,000.00 into the business" to help Travaglini obtain a visa.  Id. ¶ 53.  As a result, Vance accepted a vehicle and a laptop which were purchased using AMT funds.  Id. ¶ 54.  Travaglini remained "barred" from the United States.  Id. ¶ 55.

In September of 2024, Vance gave Travaglini and Dioguardi an "ultimatum"—contribute $60,000 to AMT/TT21 to pay the cost of expenses or terminate their profit-sharing arrangement. Id. ¶ 57.  Travaglini and Dioguardi failed to contribute the funds, so Vance terminated the agreement.  Id. ¶ 58.

4

After Vance terminated the agreement, he did not hear from anyone, except for an occasional text from Travaglini.  Id. ¶ 59.  Then, in February of 2025, Counter-Defendants demanded that Vance pay them for work he performed after he terminated their agreement.  Id. ¶ 59.  This work was obtained and performed without any assistance from Counter-Defendants. Id.

## II.   ANALYSIS[2]

Vance brings four claims in his amended counter-complaint.  He brings a fraud in the inducement/recission claim against Dioguardi only.  Am. Countercl. at PageID.207–208.  He brings a breach of contract claim, promissory estoppel claim, and unjust enrichment/quantum merit claims against all Counter-Defendants.  Id. at PageID.208–211.

### A.  Dioguardi's Individual Liability

Dioguardi argues that the amended counter-complaint does not sufficiently allege facts to support his individual liability as to the contract and quasi-contract claims against him. Dioguardi Mot. at PageID.230 (Dkt. 23).  Dioguardi asserts that his participation amounted to "reaffirm[ing], ratify[ing], or participat[ing] in discussions related to the business relationship" which do not "establish facts" to support his individual liability and that the counter-complaint does not allege "veil-piercing or alter-ego facts," which he argues means that the contract and quasi-contract claims against him fail.  Id.

In Michigan, an individual corporate officer will generally not be held "liable for his

---

[2] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The plausibility standard requires courts to accept the alleged facts as true and to make all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Both parties' briefs cite Michigan law so the Court applies Michigan law.

corporation's engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." Livonia Bldg. Materials Co. v. Harrison Const. Co., 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (punctuation modified).

However, the alleged contract breaches in November 2023 and April 2024 were oral contracts. Am. Countercl. ¶¶ 27–30, 44–46. Thus, the Court cannot rely on signatures to determine whether Dioguardi has individual liability. Without further factual development, the Court cannot determine at this stage whether Dioguardi was acting personally or on behalf of AMT and/or TT21 when he allegedly orally entered into the November 2023 and April 2024 contracts with Vance. Whether there are facts to support individual liability does not need to be determined at the pleading stage. All that is required to state a breach of contract claim under Michigan law is to allege the elements of a valid contract and then allege (i) the terms of the contract, (ii) breach of those terms by defendant(s), and (iii) injury as a result of the breach. Bowlers' Alley, Inc. v. Cincinnati Ins. Co., 32 F. Supp. 3d 824, 831 (E.D. Mich. 2014). There is no dispute that agreements existed. See Am. Compl. ¶ 6 (Dkt. 4); Am. Countercl. ¶¶ 27–30, 44–45, 70. The amended counter-complaint also alleges the terms of the agreements, that the agreements were breached, and that Vance was harmed. See Am. Countercl. ¶¶ 28–29, 44–45, 58, 74–76. These allegations are sufficient to allege a breach of contract claim.

### B. Personal Jurisdiction of TT21

TT21 argues that the Court does not have personal jurisdiction over it. TT21 Mot. at PageID.255–257 (Dkt. 25). TT21 asserts that it has never done the following: transacted business in Michigan, entered into a contract to be performed in Michigan, committed acts in Michigan, or purposefully availed itself of Michigan. Id. at PageID.255–256. Further, TT21

argues that while the amended counter-complaint suggests that TT21 operated interchangeably with other parties, "group pleading" does not establish jurisdiction. Id. at PageID.256–257.

Vance argues that TT21 waived its personal jurisdiction defense because it did not raise the issue in its first motion to dismiss, which was filed before Vance amended his counter-complaint. Resp. to AMT/TT21 at PageID.304–306. TT21 filed an earlier motion to dismiss (Dkt. 17), which the Court denied without prejudice after Vance filed his amended counter-complaint. 2/13/26 Text-Only Order. TT21's first motion does not raise the issue of personal jurisdiction. See TT21 First Mot. Vance asserts that even if TT21 did not waive its personal jurisdiction defense, the Court has jurisdiction over it because of its contacts in Michigan. Resp. to AMT/TT21 at PageID.307–315. Vance includes a declaration setting forth facts in support his arguments. Vance Decl. at PageID.320–322 (Dkt. 28-1).[3]

### 1. Waiver

"[A] defendant must raise the defense[] of lack of personal jurisdiction [] in a pre-answer motion or answer, whichever is filed first, or the defense is waived." Blessing v. Chandrasekhar, 988 F.3d 889, 898 (6th Cir. 2021) (citing Fed. R. Civ. Pro. 12(h)). "The Sixth Circuit has not yet decided whether an amended complaint triggers a new Rule 12(b) process." Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC, No. 2:18-CV-735, 2019 WL 1981864, at *3 (S.D. Ohio May 3, 2019). Thus, Vance's waiver argument is not conclusive. Regardless, TT21 loses on the merits.

### 2. Merits

"Where personal jurisdiction is challenged in a Rule 12(b)(2) motion, the plaintiff has the burden of establishing that jurisdiction exists." Am. Greetings Corp. v. Cohn, 839 F.2d 1164,

---

[3] TT21 did not file a reply brief so there is no response to Vance's arguments.

1168 (6th Cir. 1988).  One way they may do so is by affidavit "set[ting] forth specific facts showing the court has jurisdiction."  Malone v. Stanley Black & Decker, Inc., 965 F.3d 499, 504 (6th Cir. 2020).

"To take jurisdiction over a corporation [], a court must examine contacts with the forum state initiated by one who is authorized to act on the corporation's behalf."  Cyr v. Real Value Prods., LLC, No. 22-10290, 2022 WL 7045559, at *5 (E.D. Mich. Oct. 12, 2022) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316–317 (1945)).  The agent's contacts with the state are imputed on the corporation.  See Cyr, 2022 WL 7045559, at *5.

Vance has alleged that Dioguardi, who resides in Michigan and has not contested this Court's jurisdiction over him, "partial[ly]" had operational control of TT21 from Michigan. Vance Decl. at PageID.321; Am. Countercl. ¶ 2.  In support, Vance asserts that Dioguardi "direct[ed] TT21's operations," in part, by "direct[ing] whether customers would be billed through [] AMT or TT21 and whether technicians would be paid through AMT or TT21."  Id. at PageID.321.  Vance also states that, while Dioguardi was in Michigan, he exchanged "hundreds of electronic messages, emails and telephone calls with Dioguardi relat[ed] to work being performed under both AMT and TT21."  Id.  Further, Vance alleged that Travaglini, on at least one occasion, traveled from Italy to Michigan to meet with Dioguardi and conduct business.  Id.

Vance specifically recalls one occasion where he performed repairs for a customer in Texas.  Vance Decl. at PageID.321–322.  He stated that the work was billed through TT21 and the logistics for the job were handled by Dioguardi from Michigan.  Id.  During the job, an issue arose concerning a failure to obtain worker's compensation insurance for TT21 technicians.  Id. at PageID.322.  Vance stated that he had a call with Dioguardi, who was in Michigan, and Travaglini, who was in Italy, to resolve the issue.  Id.

8

The Court finds that these actions demonstrate that Dioguardi appears to be an agent of TT21 as he was authorized to act on behalf of TT21. Therefore, Dioguardi's contacts with Michigan should be attributed to TT21 and the Court has jurisdiction over TT21.

### C. Fraud in Inducement/Recission

The Counter-Defendants argue that the fraud in inducement/recission claim against them is not plausibly pled because (i) it is legally deficient under Rule 9(b) as it is not particular; and (ii) the alleged misrepresentations are "promises of future conduct" which are not actionable as fraud unless it is alleged that defendants never intended to perform at the time the promise was made. Dioguardi Mot. at PageID.230–231; AMT Mot. at PageID.242–244; TT21 Mot. at PageID.257–259.

The amended counter-complaint does not allege a fraud claim against AMT or TT21. See Am. Countercl. at PageID.207–208 ("Count I Fraud in the Inducement/Recission against Counter-Defendant Dioguardi"). Thus, the Court will only analyze whether the amended counter-complaint sufficiently alleges a fraud claim against Dioguardi.

To properly allege a fraud claim under Federal Rule of Civil Procedure 9(b), Vance's counter-complaint must: "1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008).

The amended counter-complaint contains the necessary requirements. See Countercl. ¶¶ 21–29, 47. Vance alleged that Dioguardi "ratified and reaffirmed" Travaglini's promises in a November 25, 2023 Google Meet. Id. ¶¶ 27–28. During that meeting, Dioguardi further promised Vance that AMT and TT21 would "supply [] skilled PDR technicians" and that he would source new work for AMT. Id. ¶ 28. The amended counter-complaint also alleges that

9

Dioguardi failed to source any new work for AMT/TT21 and failed to send Vance competent technicians.  Id. ¶¶ 33–34, 50.  These allegations are sufficient to allege fraud in the inducement, as Vance identifies specific statements, attributes those statements, identifies when and where the statements were made, and explains why they were fraudulent.

Dioguardi's next argument, that the amended counter-complaint does not sufficiently allege fraud because the alleged misrepresentations are promises of future conduct, also fails.  Dioguardi Mot. at PageID.230.  Dioguardi argues that promises regarding future conduct are not considered fraud unless Vance pleads that the speaker has the "present intent not to perform at the time the promise was made."  Id.  Dioguardi acknowledges that the amended counter-complaint asserts that he "knew" that the statements he made were false and that he acted "recklessly."  Id.  Dioguardi states that these allegations fail because they are "conclusory."  Id.

Dioguardi is incorrect.  Rule 9(b) explicitly states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  That is what Vance does in his amended counter-complaint.

### III.    CONCLUSION

For the reasons explained above, the Court denies Counter-Defendants' motions to dismiss (Dkts. 23, 24, 25).

**SO ORDERED.**

Dated: June 29, 2026                         s/Mark A. Goldsmith
Detroit, Michigan                            MARK A. GOLDSMITH
                                             United States District Judge

10

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 29, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager

11